**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Rosanne Stiles

    v.                                      Civil No. 08-cv-208-JM

Chemical & Production
Workers' Union, Local
No. 30, AFL-CIO


**O R D E R**


Plaintiff Rosanne Stiles' amended complaint sets forth two causes of action: (1) Count I, based on 29 U.S.C. § 185, alleges "a breach of the terms of the applicable collective bargaining agreement as it relates to the representation of the plaintiff by the defendant" (¶ 15); and (2) Count II, also based on 29 U.S.C. § 185, asserts "a breach of the defendant's duty to fairly represent the plaintiff as it relates to the disciplinary action taken against her by the defendant" (¶ 19).  Both counts claim: (a) a failure to properly investigate; (b) a failure to properly prepare; (c) a failure to communicate; and (d) a failure to pursue the grievance and to settle over plaintiff's objection. Defendant Chemical & Production Workers' Union, Local No. 30 has moved for summary judgment (document no. 11) claiming there is no

genuine dispute of material fact that it did not breach any duty owed to plaintiff in either the collective bargaining agreement or the grievance arbitration proceedings and, therefore, it is entitled to summary judgment on both counts.  Plaintiff objects (document no. 12).  For the reasons set forth below, defendant's motion is granted.

## **Discussion**

### **1.  Background**[1]

Plaintiff worked for over 22 years as a waitress for Volume Services of America, Inc., d/b/a Centerplate ("Centerplate"). Centerplate provided food and beverage services to Rockingham Ventures at its track facility known as Rockingham Park.  Through Centerplate, plaintiff worked at Rockingham Park.

On January 6, 2007, plaintiff was suspended from work following an altercation she had with her manager.  Plaintiff was upset because another waitress had apparently left her assigned shift location early to go work in Rockingham Park's poker room,

---

[1]More detailed facts are discussed in the analysis section as they pertain to the various issues before the court.  Only a brief summary of the incidents out of which this action arose is set forth here, based on defendant's statement of material facts. See Def.'s Mem. in Supp. of Mot. for Summ. J. (document no. 11-2) ("Def.'s Mem.") at 1-13.

which was against company policy.  When plaintiff's shift ended that day, she went into the poker room to tell the manager what she had observed.  In front of customers, plaintiff "protested" this reassignment and told her manager she was going to report it to "corporate."  A disagreement ensued, ending with the manager following plaintiff out of the room and warning her that she would be "written up."  Plaintiff was suspended from work while the incident was investigated.

On January 9, 2007, defendant's business agent, John McDonough ("McDonough"), met with plaintiff, who had filed a grievance about her suspension.  Plaintiff explained to McDonough the company rule that waitresses were not allowed to leave a shift early and go into the poker room, and admitted she yelled at her manager that she would report the January 6 shift change to corporate, which prompted him to chase her across the poker room.  Plaintiff, McDonough and another union representative then met with Centerplate officials to discuss plaintiff's grievance. Centerplate informed plaintiff and the union representatives that it had statements from witnesses to the incident that reported plaintiff had used profanity.  They also told the union representative that Centerplate had an established grievance

procedure plaintiff should have followed.  Although McDonough
urged Centerplate to reinstate plaintiff, Centerplate decided to
terminate her.  As a result, plaintiff's grievance was amended to
include the termination and seek arbitration.

On January 25, 2007, Centerplate provided McDonough with
copies of the statements about plaintiff's behavior on January 6.
The statements were from a manager, three employees and a
customer.  McDonough began to investigate plaintiff's work
history and learned she had been outspoken and temperamental with
management and other employees several times previously.  Many of
those outbursts had been tolerated, but plaintiff had received
disciplinary write-ups on at least five previous occasions
between 1986 and 2000.  In December 2004, plaintiff had been
banned by Rockingham for one week because of her inappropriate
conduct toward other track employees.  Significantly, in January
2005 Centerplate had provided plaintiff with "a final written
warning and notice that if she engaged in any verbally abusive
behavior towards management or other employees in the future, she
would be terminated."  Def.'s Mem. at 3.

Following this investigation, defendant union's attorney,
John Ward, concluded that arbitration should be demanded,

4

thinking that an arbitrator might reinstate plaintiff because of her many years of service despite the strong evidence that the altercation occurred as reported.  Ward and Centerplate agreed on an arbitrator and set a hearing date for September 20, 2007.  On July 19, 2007, Ward sent a document request to Centerplate seeking numerous documents relevant to plaintiff's grievance.  He also wrote a letter to plaintiff's attorney, Scott Gleason, advising him of the September 20 hearing date and informing him of a planned August meeting with plaintiff.

To prepare for the hearing, McDonough agreed to travel to New Hampshire in August 2007 to meet with plaintiff and any witnesses she might have.  McDonough left several voice messages with plaintiff asking her to call him on his cell phone to arrange to meet on August 8 and 9.  Instead of calling his cell phone, plaintiff called McDonough's office on August 9, when he was already in New Hampshire, instructing him to arrange through Gleason the meeting with her.  Because McDonough and plaintiff never met, defendant requested the September 20 hearing be postponed to give them additional time to prepare.  After notifying plaintiff of her need to cooperate, Ward and McDonough arranged for another meeting with her on September 20 to review

evidence, including both documents and witnesses.  Plaintiff did
meet with Ward and McDonough as planned, but failed to provide
any potential witnesses that day or to identify any documents for
the hearing.  Plaintiff told Ward and McDonough that she
suspected Rockingham would not let her return to its property,
but got upset when asked why she thought that.  Plaintiff told
Ward that it was his job to get her back to work and that Gleason
would handle matters with Rockingham.

Defendant worked with Centerplate to exchange information in
preparation for the arbitration hearing, now scheduled for
October 15.  Ward reminded plaintiff by letter dated October 3
that she needed to provide him with witness information and any
documents she thought were relevant to her case.  Finally on
Friday afternoon, October 12, with the hearing scheduled to begin
Monday, October 15, plaintiff provided Ward with the names of 5
witnesses.  Ward met with those witnesses Monday morning before
the hearing began.  Ward never received the requested information
regarding plaintiff's interim wages, however, so Ward sought and
obtained Centerplate's agreement to bifurcate the arbitration
hearing to address the termination first and the back-pay issue
subsequently.  After a full day of hearing, the arbitration was

continued to December 18, 2007.

On October 17, Centerplate expressed an interest in settling the grievance, which Ward communicated to plaintiff.  Although plaintiff was not receptive to the idea initially, she eventually agreed to consider a settlement that included a waiver of her demand for reinstatement.  She advised Ward that she would discuss that proposal further with Gleason and get back to Ward with her demand.  She also promised she would provide Ward with the documents needed to calculate her lost wages.

On November 19, Centerplate confirmed plaintiff's earlier suspicion that Rockingham would not allow her to return to its property even if she succeeded in her arbitration.  With this news defendant reassessed its strategy, because it had assumed plaintiff was more likely to get reinstatement than back-pay and now it was apparent reinstatement was not a viable remedy.  That same day Centerplate offered to settle the grievance for $2,500.  Ward called plaintiff to advise her of Rockingham's decision and relay Centerplate's settlement offer.  Plaintiff was upset by the offer and expressed as much to Ward.  Ward asked plaintiff to provide him with the documents needed to calculate her lost wages and to respond to Centerplate's settlement by November 30.

Plaintiff did not comply with either request.

Defendant then estimated plaintiff's earnings would have been $22,000, that her interim earnings were approximately $11,000 since her termination and offered to accept a figure of $11,000 in settlement of plaintiff's claim.  Centerplate countered with a $5,000 offer on December 12, 2007.  Defendant rejected that offer, but proposed a non-wage settlement of $15,000, along with neutral recommendations and a mutual release, because defendant thought its proposal was fair, informed Centerplate it would accept the settlement even without plaintiff's approval.

The parties negotiated the terms back and forth before finally agreeing on December 14 to a settlement for $10,000 payment to plaintiff for back-pay and other injuries in exchange for, among other things, mutual releases.  Ward advised Gleason of the settlement agreement.  On December 17, Gleason informed Ward that plaintiff rejected the settlement, but defendant decided to accept it over plaintiff's objections.

On January 24, 2008, Ward sent Gleason a detailed letter explaining the settlement terms and the many reasons why defendant had agreed to accept it.  Ward emphasized that

Rockingham's decision to ban plaintiff from returning to work on its property was critical to the settlement decision, because plaintiff's disciplinary history made an award of back-pay unlikely, and Rockingham's decision made any potential reinstatement order a nullity.  Ward advised Gleason that he believed the settlement was a better result than plaintiff would have received through arbitration.  On March 19, Gleason finally responded to Ward's letter, disagreeing with his assessment.  On April 3, Ward sent Gleason the final settlement agreement for review and comment.  Gleason objected to releasing Rockingham from liability, and Ward brought that concern back to Centerplate in an effort to remove that term from the agreement.  Centerplate would not agree to removing the Rockingham release, however, which Ward advised Gleason of on July 3, 2008.

Plaintiff's tax returns indicate that she earned $19,437 in 2006.  In 2007, the year she was terminated from Centerplate, she reported $5,596 in wages, salary and tips from employment and $4,628 in unemployment compensation, for a total of $10,224.

## 2.  Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  A genuine issue is one "that properly can be resolved
only by a finder of fact because [it] may reasonably be resolved
in favor of either party."  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 250 (1986).  A material fact is one "that might affect
the outcome of the suit."  Id. at 248.  In ruling on a motion for
summary judgment, the court construes the evidence and all
inferences reasonably drawn therefrom in the light most favorable
to the nonmovant.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94
(1st Cir. 2001); Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53
(1st Cir. 2000).

The party moving for summary judgment bears the initial
responsibility of demonstrating the absence of a genuine issue of
material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).  Once the moving party has met its burden, the burden
shifts to the nonmovant to "produce evidence on which a
reasonable finder of fact, under the appropriate proof burden,
could base a verdict for it; if that party cannot produce such
evidence, the motion must be granted."  Ayala-Gerena v. Bristol

10

Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex,
477 U.S. at 323 and Anderson 477 U.S. at 249).   Neither
conclusory allegations, improbable inferences, nor unsupported
speculation are sufficient to defeat summary judgment.   See
Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002); see
also Price v. Canadian Airlines, 429 F. Supp. 2d 459, 461 (D.N.H.
2006).

        In order to "properly oppose" a motion:

                an adverse party may not rest upon the mere
                allegations or denials of the adverse party's
                pleading, but the adverse party's response,
                by affidavits or as otherwise provided in
                this rule, must set forth specific facts
                showing that there is a genuine issue for
                trial.

Fed. R. Civ. P. 56(e).   In addition, this Court's local rules
provide that:

                All properly supported material facts set
                forth in the moving party's factual statement
                shall be deemed admitted unless properly
                opposed by the adverse party.

United States District Court District of New Hampshire Local Rule
("LR") 7.2(b)(2).   Plaintiff has failed to comply with the
affidavit requirements in Fed. R. Civ. P. 56 (c) & (e).   She also
has not fully complied with the requirement that she provide "a

short and concise statement of material facts, supported by appropriate record citations, *as to which [she] contends a genuine dispute exists* so as to require a trial." LR 7.2(b)(2) (emphasis added).

When, as is the case here, the nonmoving party fails to provide any documentation to refute the moving party's properly supported statement of material facts, those facts must be accepted as true. See LR 7.2(b)(2); see also Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 219 (1st Cir. 2007) (deferring to district court's enforcement of local rules). An improperly supported opposition motion does not automatically give rise to a grant of summary judgment, however, because the moving party still bears the burden of demonstrating no genuine issue of material fact exists on any claim or defense it is asserting. See Cordi-Allen v. Halloran, 470 F.3d 25, 28 (1st Cir. 2006) (citing authority); see also Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 25 (1st Cir. 2006) (same); Fed. R. Civ. P. 56 (c) & (e). The district court must still review the merits of the case based on the record before it, to determine whether summary judgment is appropriate. See Aguiar-Carrasquillo 445 F.3d at 25. Once the record is so assessed, summary judgment

enables the court to "pierce the boilerplate of the pleadings"
and "dispos[e] of cases in which no trial-worthy issue exists."
<u>Quinn v. City of Boston</u>, 325 F.3d 18, 28 (1st Cir. 2003) (citing
<u>Suarez</u>, 229 F.3d at 53).

### 3.   Analysis of Plaintiff's Claims

#### a.   Count I

Count I, to the extent that it is anything other than
another iteration of Count II, is somewhat of a mystery.
Plaintiff does not provide any explanation of what terms of the
collective bargaining agreement, as they relate to representation
of her, defendant allegedly breached.  She simply asserts that
defendant's conduct breached "the terms of the applicable
collective bargaining agreement" without citing which terms give
rise to an individual cause of action against the union.  <u>See</u> Am.
Compl., ¶ 15.  A review of that agreement, <u>see</u> Def.'s Mem., Ex.
14 ("Collective Bargaining Agreement") (document no. 11-34), does
not reveal any provision relating to defendant's representation
of plaintiff that defendant could have breached.  Plaintiff's
objection to the motion for summary judgment does not offer any

facts or argument to support the claim.[2]  The Collective
Bargaining Agreement simply has no language creating an
enforceable obligation against the union by individual employees.

     The law recognizes that a union, as the exclusive bargaining
representative of employees, has a statutory duty to fairly
represent those employees both in collectively bargaining for the
employees and in enforcing the resulting agreement.  <u>See</u> <u>United
Steelworkers of America, AFL-CIO-CLC v. Rawson</u>, 495 U.S. 362, 372
(1990) (citing <u>Vica v. Sipes</u>, 386 U.S. 171, 177 (1967) to show
the rule is now "well established").  This duty of fair
representation does not arise from the collective bargaining
agreement, but instead arises from the National Labor Relations
Act itself and is breached "only when a union's conduct toward a
member of the collective bargaining unit is arbitrary,
discriminatory, or in bad faith."  <u>Id.</u> at 373-74 (internal
quotation omitted).  A collective bargaining agreement may be
negotiated to require the union to assume other responsibilities
towards the employees through some additional duty of care, as

---

     [2]Both parties address the necessity for an allegation that
plaintiff's employer violated the collective bargaining agreement
but that is not the thrust of the Count I claim.  Count I
attempts to assert a claim against the defendant union based on
its alleged violation of the Collective Bargaining Agreement.

plaintiff seems to allege in Count I, however such a duty would
be contractual and would need to be articulated expressly in the
agreement.  See id. at 374 (explaining the limits on the duty of
fair representation).  "If an employee claims that a union owes
him a more far-reaching duty, he must be able to point to
language in the collective-bargaining agreement specifically
indicating an intent to create obligations enforceable against
the union by the individual employees."  Id. at 374 (citation
omitted).

Plaintiff has not pointed to any such language, and I have
been unable to find any provision in the Collective Bargaining
Agreement that "relates to the representation of the plaintiff by
the defendant."  Am. Compl. ¶ 15.  There is nothing in the
agreement that could fairly be read to create a private right of
action by union members against the union.  Defendant's motion
for summary judgment on Count I is granted.

b.  Count II

In Count II, plaintiff asserts that defendant breached its
statutory duty, discussed supra, to fairly represent her in the

15

grievance proceedings which followed her termination.[3]  See Am.
Compl. ¶ 17.  Since defendant has no duty to represent plaintiff
in a meritless claim against her employer, for plaintiff to
succeed on Count II she must prove that her termination violated
the terms of the collective bargaining agreement[4] and that
defendant's representation of her was done either in bad faith or
in an arbitrary or discriminatory manner.  See Teamsters v.
Terry, 494 U.S. 558, 564 (1992) (explaining the union's duty to
pursue an employee's grievances against an employer); see also
Emmanuel v. Int'l Bhd. of Teamsters, 426 F.3d 416, 420 (1st Cir.
2005) (same).  Plaintiff contends here that defendant's
settlement of her grievance was done arbitrarily and in bad

---

[3]"The duty [of fair representation] requires a union 'to
serve the interests of all members without hostility or
discrimination toward any, to exercise its discretion with
complete good faith and honesty, and to avoid arbitrary
conduct.'"  Teamsters v. Terry, 494 U.S. 558, 563 (1992)(quoting
Vaca, 386 U.S. at 177).

[4]Defendant first argues it is entitled to judgment as a
matter of law because plaintiff did not allege in her complaint
that Centerplate violated the Collective Bargaining Agreement
when it discharged her.  Construing the record in the light most
favorable to plaintiff, as I must do on defendant's motion for
summary judgment, plaintiff's reference to her grievance brought
against Centerplate can reasonably be understood to assert a
claim that her discharge was in breach of the agreement.  See Am.
Compl. ¶ 8.  I decline, therefore, to grant summary judgment on
this basis.

faith, in breach of its duty to fairly represent her.

I adopt plaintiff's succinct statement of the applicable law
on this point:

> A union acts arbitrarily or in bad faith "if,
> in light of the factual and legal landscape at
> the time of the union's actions, the union's
> behavior is so far outside a wide range of
> reasonableness as to be irrational."
> Emmanuel, supra at 420 (quoting Miller v.
> United States Postal Service, 985 F.2d 9, 11–
> 12 (1st Cir. 1993)).  This standard accords
> the unions substantial deference and ample
> latitude to perform their representative
> functions.  Id.  In addition, a union's mere
> negligence or erroneous judgment will not
> constitute a breach of duty of fair
> representation.  Miller, supra at 12.  A
> union's failure to take a grievance to
> arbitration is a breach only when it is truly
> arbitrary or irrational.  Newbanks v. Central
> Gulf Lines, 64 F. Supp. 2d 1, 5 (D. Mass.
> 1999).
>
> In order to successfully defend against a
> motion for summary judgment on a duty of fair
> representation claim, the plaintiff must point
> the court to record evidence supporting any
> one or all of the elements, specifically that
> the union acted arbitrarily or in bad faith or
> in a discriminatory manner.  Morales, supra at
> 16, quoting [sic] Griffin v. Air Line Pilots
> Ass'n, Int'l, 32 F.3d 1079, 1083 (7th Cir.
> 1994).

Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp.
Mem.") (document no. 12) at 4.

Plaintiff points to four alleged breaches of duty by

17

defendant which I consider in turn.

    (i)  <u>Failure to Properly Investigate</u>

The First Circuit has clearly articulated a requirement that a union has a duty to investigate alleged grievances.

> The duty of fair representation mandates that a union conduct at least a "minimal investigation" into an employee's grievance. <u>Garcia v. Zenith Elec. Corp.</u>, 58 F.3d 1171, 1176 (7th Cir. 1995). But under this standard, only an "egregious disregard for union members' rights constitutes a breach of the union's duty" to investigate. <u>Caselli v. Douglas Aircraft Co.</u>, 752 F.2d 1480, 1483 (9th Cir. 1985).

<u>Emmanuel</u>, 426 F.3d at 420.

Defendant has established the following undisputed material facts relating to its investigation:

- On January 9, 2007, within three days of plaintiff's suspension, the union filed a grievance about the incident on plaintiff's behalf.  Document no. 11-3, ¶ 17.

- On January 17, 2007, defendant interviewed plaintiff and obtained her version of the facts surrounding the termination.  Document no. 11-3, ¶ 18; document no. 11-25.

- Also on January 17, 2007, the union obtained the company's side of the story.  Document no. 11-3, ¶ 19; document no. 11-25.

- On January 17, 2007, the union requested copies of statements and other information that the company had relied upon in making its decision to terminate plaintiff.  Document no. 11-3, ¶ 20.

18

- On January 25, 2007, the union received from
  the company and reviewed:
  - statements from a customer, three co-
    employees, and a manager; and
  - highlighted "Employment Policies" and
    "Standards of Conduct" the company stated
    that she violated by using foul language
    and gestures to a management employee
    and in front of customers; and a 1/6/05 "final
    warning" for harassment and misconduct
    which she had previously been given.

- In July of 2007, the union representative left
  several unanswered voice messages for plaintiff
  seeking to arrange to meet with her on August 8th
  or 9th in New Hampshire to prepare her testimony
  for the scheduled September 20th arbitration.
  Document no. 11-3, ¶ 27.

- On August 7th, the union representative traveled
  to New Hampshire and left more unanswered voice
  mails to plaintiff to arrange a meeting on the
  8th.  Document no. 11-3, ¶ 28.

- Having continued the hearing to October, the
  union's representative wrote plaintiff, warning
  her of non-cooperation, its right not to have to
  deal with her through her lawyer and that a
  failure to contact the union on or before August
  31st would result in withdrawal of the grievance.
  Document no. 11-3, ¶ 30, document no. 11-11.

- Prior to an arranged September 20th meeting,
  the union told plaintiff that it wanted to
  prepare her and her witnesses for the arbitration
  hearing.  Document no. 11-3, ¶ 31.

- At the September 20th meeting, the plaintiff
  did not bring any witnesses nor arrange for
  the union representative to meet any.  Document
  no. 11-3, ¶ 32.

19

- Plaintiff was asked to identify her witnesses and
  provide any documents she thought relevant.
  Document no. 11-3, ¶ 33.  She refused to do so at
  the meeting, but said she would within a week.
  Document no. 11-4, ¶¶ 24, 30.

- On October 3rd, the union sent plaintiff a letter
  reminding her that she had not identified her
  witnesses, had not provided relevant documents and
  told her that she must provide employment and
  interim compensation information as it was
  required to prove up her lost wages and to respond
  to the company's document request.  Document no.
  11-12.

- On October 12th, plaintiff provided five names and
  her attorney faxed some documents, primarily of
  witnesses to the event and her past good work.
  Document no. 11-4, ¶¶ 34, 35; document no. 11-21.

- Prior to the hearing, plaintiff provided no
  information on interim earnings and the union
  obtained the company's agreement to bifurcate lost
  earnings out of the initial stage of arbitration.
  Document no. 11-4, ¶ 36-37.

- Prior to the hearing on October 15, 2007, the
  union attorney met with and prepared five
  witnesses plaintiff brought.  Document no. 11-4,
  ¶ 38.

- When the union learned that the owner of the race
  track where plaintiff had worked for her employer
  would not allow plaintiff's employer to bring her
  back, even if she was reinstated, the union began
  efforts to settle the case on the basis of her
  wage claim and again sought receipt of the
  information on interim wages by November 30th.
  Document no. 11-4, ¶¶ 45-49.

- The interim wage information was not supplied by
  plaintiff as requested.  Document no. 11-4, ¶ 51.

20

In the face of the uncontradicted and overwhelming evidence of
this thorough investigation, plaintiff has not offered a single
fact or argument to establish a failure to properly investigate.

The union met its duty to investigate in a complete and
professional manner despite a shocking lack of cooperation by
plaintiff.  Summary judgment on the investigation issue is
granted to defendant.

(ii)  Failure to Prepare for Arbitration

Plaintiff's complaint and objection to the motion for
summary judgment do not set out a single alleged fact or argument
to demonstrate a failure to prepare for arbitration.  The record
is silent as to any failure to prepare, let alone one that rises
to the level of a breach of the duty of fair representation.

While the duty to prepare for arbitration is not as clearly
delineated as the duty to investigate, courts have recognized
such a duty inferentially.  See U.S. Postal Serv. v. Lettis, 39
F. Supp. 2d 181, 200–02 (E.D.N.Y. 1998) (explaining differences
in strategy and judgment do not constitute bad faith); Ghartey v.
St. Queen's Hosp., Local 1199, 869 F.2d 160, 163 (2d Cir. 1989)
(discussing challenge to union's representation in arbitration).
Investigation is a prime component of preparation.  The

undisputed facts set forth above pertaining to defendant's duty to investigate clearly establish that the union obtained appropriate and thorough discovery of Centerplate's documents and oral evidence, interviewed and prepared plaintiff and her witnesses, and sought all of plaintiff's relevant documents.  The flaws, if any, in preparation were solely due to plaintiff's uncooperative delays in producing witnesses and documents.

Defendant has provided substantial material evidence of preparation for arbitration.  Plaintiff has provided no evidence of defendant's failure to adequately prepare.  Summary judgment is granted to defendant on the issue of arbitration preparation. See Lettis, 39 F. Supp. 2d at 202 (bald assertions uncorroborated by any evidence cannot overcome summary judgment).

(iii)  Failure to Communicate with Plaintiff

The frivolity of this claim is demonstrated by the total absence of a single alleged failure to communicate by defendant. As demonstrated by the facts outlined above, in the discussion of the duty to investigate, defendant made numerous unanswered telephone calls to plaintiff, sent letters to plaintiff and to her attorney, met with plaintiff and talked with plaintiff.  That defendant did not withdraw the grievance based on plaintiff's

22

flagrant lack of communication and cooperation is a testament to the professionalism and dedication of the union.

Defendant has demonstrated by undisputed material facts that it has more than met its communication duties in fairly representing plaintiff.  Whatever plaintiff's counsel had in mind in alleging a "failure to communicate", he has certainly kept it hidden.  Nothing in the record remotely substantiates a claim that defendant acted in bad faith or arbitrarily when it attempted to communicate with plaintiff.  "The district court is free to disregard arguments that are not adequately developed." Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999).  Summary judgment for defendant is also granted on the alleged breach of defendant's duty to communicate.

     (iv)  <u>Failure to Pursue the Grievance and
             to Settle over Plaintiff's Objection</u>

Plaintiff's final claim that defendant acted arbitrarily and in bad faith in representing her against Centerplate focuses on defendant's decision to settle her claim rather than continue with the arbitration.  In particular, plaintiff asserts that witnesses at the arbitration hearing supported her position about what had happened on January 6, 2007, and that the union representative at the hearing told her counsel that the hearing

was going well.  See Pl.'s Opp. Mem. at 5.  Because plaintiff
perceived the arbitration was proceeding favorably, she did not
understand why defendant contacted Rockingham Park about her
returning to work there, or why defendant settled her grievance
before the issue of her reinstatement was arbitrated.  See id. at
5-6.  She now contends defendant's decisions both to reach out to
Rockingham Park about the reinstatement issue and to settle her
grievance after learning Rockingham's position demonstrate its
bad faith and arbitrary conduct in breach of its duty to fairly
represent her.

     A union acts arbitrarily only if, "at the time of [its]
actions, the union's behavior is so far outside a wide range of
reasonableness as to be irrational."  Miller v. U.S. Postal
Serv., 985 F.2d 9, 11-12 (1st Cir. 1993) (citing Air Line Pilots
Ass'n v. O'Neill, 499 U.S. 65, 78 (1991)).  A reviewing court
must examine the competence of the union's representation
objectively, but also must recognize the union's need for
substantial deference and wide latitude in determining how to
represent its members.  See Emmanuel, 426 F.3d at 420 (citing
authority).  By contrast to the objective standard on which
arbitrariness is evaluated, the questions of whether a union

acted in bad faith or discriminatorily are reviewed based on a

subjective standard.   See Crider v. Spectrulite Consortium, Inc.,

130 F.3d 1238, 1243 (7th Cir. 1997).

> Although whether the Union's conduct was
> discriminatory and whether it was in bad
> faith must be analyzed separately, the analyses
> are related.  Whereas the arbitrariness analysis
> looks to the objective adequacy of the Union's
> conduct, the discrimination and bad faith analyses
> look to the subjective motivation of the Union
> officials.

Id. (citing Trnka v. Local Union No. 688, UAW, 30 F.3d 60, 63

(7th Cir. 1994)).

   Plaintiff's Objection does not clearly delineate the facts

and arguments related to alleged "arbitrariness" from those of

alleged "bad faith."   However, it appears that plaintiff relies

on the following facts to establish arbitrariness.

> •   Union counsel told plaintiff after the first day
>     of arbitration that it was "going well."  Document
>     no. 12-23, ¶ 12.
>
> •   Union counsel told plaintiff's attorney that
>     plaintiff had a "good shot" at reinstatement.
>     Document no. 12-11.[5]
>
> •   Plaintiff had more favorable witnesses to present
>     at day two of the arbitration.  Document no. 12-

---

[5]While many of plaintiff's documents have not been
authenticated and, therefore, justifiably could be disregarded, I
have considered them as though they were authenticated since they
do not alter the disposition of the pending motion.

23, ¶ 12.

- Despite this promising start, defendant negotiated a settlement over plaintiff's objection.  Document no. 12-17.

- Defendant agreed to a provision releasing Rockingham Ventures without plaintiff's consent. Document no. 12-11.

- Defendant did not give plaintiff's attorney specific case citation to support the position that Rockingham Ventures, owner of the track, could bar plaintiff from the track even if she were reinstated to employment with Centerplate. Document nos. 14, 17.

Pl.'s Opp. Mem. (document no. 12) at 5-7.

To support her claim of bad faith, plaintiff relies on the

following allegation:

- "Prior to the arbitration, the defendant expressed hostility to the plaintiff for engaging a private attorney to assist her. (Document no. 12-6)." Document no. 12 at 5, 7.

- Defendant unilaterally agreed to a settlement. Document no. 12 at 7.

- Defendant did not provide legal authorities to plaintiff's counsel on Rockingham's authority to bar her or why Rockingham should be released. Document no. 12 at 6.

- The settlement was without consent.  Document no. 12 at 7.

Nothing in these allegations intimates, let alone

demonstrates, some irrationality or ill-motive on defendant's

26

part to support plaintiff's claims of arbitrariness and bad faith.  The paucity of evidence, case support and convincing argument by plaintiff is starkly revealed in the face of the facts and arguments of defendant.  Unions are allowed "great latitude in determining the merits of an employee's grievance and the level of effort it will expend to pursue it."  <u>Miller</u>, 985 F.2d at 12.  The undisputed facts of this case establish that defendant's representation was thorough, professional, thoughtful and free from arbitrariness and bad faith.

Plaintiff had a disciplinary history of use of obscene gestures, verbal abuse and altercations with managers in front of patrons.  <u>See</u> Document nos. 11-3, ¶ 12; 11-66 to 11-76; 11-81. She had previously been banned from Rockingham's property.  <u>See</u> Document no. 11-3.  She also previously had been given a written termination warning.  <u>See</u> Document no. 11-57.  The incident precipitating the termination involved an admitted altercation with a manager in front of patrons.  <u>See</u> Document no. 11-4, ¶ 8. She disputed using foul language, <u>see</u> <u>id.</u>, but some witnesses said she both used the "F" word and made an obscene gesture.  <u>See</u> Document no. 11-26.  While a less dedicated union might well have avoided this uphill battle, defendant proceeded with a grievance

seeking reinstatement.

The union filed a grievance on plaintiff's behalf and pursued it to arbitration.  Plaintiff claims that defendant's letter of August 24, 2007, <u>see</u> Document no. 12-6, demonstrates hostility because the union declined to deal with her attorney, not her.  The letter, however, is not hostile but simply states a position totally consistent with the law of labor relations, which gives the union broad discretion in fairly representing its members.  Neither plaintiff nor her attorney had any right to "run the show."  "An important part of a union's broad discretion in handling an employee's grievance is the right to limit the role of a grievant's private attorney. . . .  A union has the right to be the sole representative of its members, and it can refuse to include private counsel in its handling of a grievance if it so chooses."  <u>Shufford v. Truck Drivers, Helpers, Taxicab Drivers</u>, 954 F. Supp. 1080, 1091-92 (D. Md. 1996) (citing <u>Garcia v. Zenith Elec. Corp</u>, 58 F.3d 1171, 1179 (7th Cir. 1995) (citing additional cases)).

The record here demonstrates that defendant reasonably and rationally exercised its discretion in dealing with plaintiff and her private counsel.  Certainly having its telephone calls

28

ignored when trying to set up a meeting justifies making it clear
to plaintiff that the union gets to run the show under the law.
In addition, defendant did deal with plaintiff's attorney.  It
sought documents and information from him, kept him advised,
discussed the settlement with him and sought input from him about
it, and tried to accommodate his concerns.  Plaintiff's hostility
argument on this basis is frivolous.

As I found <u>supra</u>, defendant thoroughly investigated
plaintiff's grievance and prepared for the arbitration
proceedings.  The evidence shows that defendant appropriately
handled the arbitration proceedings and reasonably determined it
was best to settle plaintiff's claims rather than continue to
arbitrate them.  The following facts substantiate this
conclusion.

Prior to that arbitration, on September 20th, plaintiff told
defendant's attorney that she had reason to believe that
Rockingham Ventures would not let her return to the property.
<u>See</u> Document 11-3, ¶ 34.  After the first day of arbitration on
October 17, defendant's attorney discussed with Centerplate's
attorney the company's interest in settling the grievance.
<u>See</u> Document no. 11-4, ¶ 42.  After some initial hostility,

29

plaintiff agreed to consider proposing a settlement demand which would waive her right to reinstatement, promised to discuss it with her attorney, and agreed to send documents necessary to compute lost wages.  See Document no. 11–4, ¶ 44.  On November 19, Centerplate's lawyer advised that Rockingham Ventures had barred plaintiff from the track, so she could not return even if she were awarded reinstatement.  See Document no. 11–4, ¶ 45.  The union representative confirmed this on November 21st by a direct telephone conversation with Edward Callahan, president and general manager of Rockingham Park.  See Document no. 11–3, ¶ 40.

Defendant had good reason to conclude that any reinstatement award under these circumstances would not get plaintiff's job back.  See Document no. 11–3, ¶ 41.  The arbitrator had no authority to order Rockingham to do anything.  See Document no 11–4, ¶ 46.  Arbitration case law provides ample support for the conclusion that in these circumstances, where reinstatement is not an option, an award of back–pay is the proper remedy.  See Def.'s Reply Mem. (document no. 14) at 7 (citing Burns Int'l Security Serv., 98 LA 226 (Cox, Arb. 1991) (client's refusal to grant security clearance to guard made reinstatement to client's facility impossible); First Student Inc., 121 LA 575 (McCurdy,

30

Arb. 2005) (no remedy available for bus driver who was banned from route by school district); <u>Southern Ocean Transport</u>, 124 LA 464 (Wolfson. Arb. 2007) (no remedy for truck driver improperly banned from client's property); <u>Wackenhut Corp.</u>, 121 LA 1623 (Landau, Arb. 2006) (appropriate remedy for wrongful discharge of employees who are banned from property is back-pay))[6].

Defendant tried to report the information on a ban and to discuss the benefits of settlement and risks of going forward, but plaintiff got loud and verbally abusive. <u>See</u> Document no. 11-4, ¶ 47-48. Defendant advised her by letter that it would deal with her attorney on settlement issues. <u>Id</u>., ¶ 48. Despite repeated requests for interim wage information, defendant was forced to estimate the interim wage discount and lost earnings because of plaintiff's failure to provide the information. <u>See</u> Document no. 11-4, ¶ 49-51. Its estimate is remarkably accurate, as a subtraction of plaintiff's 2007 income of $10,224, based on interim earnings and unemployment compensation (document no. 11-91), from her 2006 earnings of $19,437 (document no. 11-90) reflects a net loss of $9,213, and the union estimated a loss of

---

[6]Copies of these decisions were appended to Def.'s Reply and may be found online at The Bureau of National Affairs, Inc., Labor and Employment Law Library, Labor Arbitration Decisions, <u>www.bna.com/corp/index.</u>

$11,000 (document no. 11-4, ¶ 51).  After much back and forth, the union and company arrived at a settlement amount of $10,000, tax and employment security advantageously allocated at one-third back wages and two-thirds non-wage.

The settlement was rejected by plaintiff on December 17, 2007.  See Document no. 11-4, ¶ 58.  On January 24, 2008, the union sent plaintiff's counsel a thorough review, analysis and rationale for its conclusion that the settlement was in the best interest of plaintiff.  See Document no. 12-12.  Whether or not plaintiff or her attorney agree with the analysis or conclusion is beside the point.  The letter clearly shows a sound and fair analysis and it belies any suggestion that the union acted arbitrarily or in bad faith.  In fact, the union achieved a settlement in excess of the amount plaintiff could have obtained in any award for back pay.

Plaintiff makes much of Centerplate's requirement that Rockingham be released from any and all claims against it she might assert.  However, the absence of any hint by plaintiff's counsel that she had any viable cause of action against Rockingham demonstrates that she was not giving up anything but the opportunity for a frivolous suit.

In summary, Rockingham's position cut the legs from under any worthwhile reinstatement order in arbitration. Defendant negotiated a very favorable cash settlement, particularly given the facts of the discharge and plaintiff's failure to provide repeatedly requested wage information. Defendant never acted in a hostile manner despite repeated provocation by plaintiff. Defendant's settlement rationale was well supported and considered.

Finally, a union does not need to obtain plaintiff's consent before settling a grievance. See Sanderson v. Ford Motor Co., 483 F.2d 102, 114 (5th Cir. 1973); Caputo v. National Ass'n of Letter Carriers, 730 F.Supp. 1221, 1230 (E.D.N.Y. 1990); Lettis v. U.S. Postal Service, 29 F.Supp. 2d 181, 197 (E.D.N.Y. 1998). There is no genuine issue of material fact as to whether the union's actions were "so far outside a wide range of reasonableness as to be irrational." Airline Pilots Ass'n Int'l, 499 U.S. at 67. Defendant is entitled to summary judgment that it did not breach any duty when it decided to settle plaintiff's claims rather than continue with arbitration. Defendant very ably fulfilled its duty to fairly represent plaintiff in her grievance proceedings.

## **Conclusion**

Defendant's motion for summary judgment (document no. 11) is granted.  The clerk is ordered to enter judgment for the defendant and close the case.

**SO ORDERED.**


_____
James R. Muirhead
United States Magistrate Judge


Date: September 24, 2009

cc:   Scott F. Gleason, Esq.
      Paul McEachern, Esq.